IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. 3:26-CR-00381-L |
| MUHAMED DIEYE | |

**UNITED STATES' MOTION TO REVOKE**
**THE EDNY RELEASE ORDER**

The United States files its Motion to Revoke the EDNY Release Order and respectfully states as follows:

# I. INTRODUCTION

Aware that he was under federal investigation, defendant Muhamed Dieye vacated his Dallas residence, moved his possessions to Kenya, and attempted to board a one-way flight out of John F. Kennedy Airport to Malaysia with his wife and children. After he scanned his boarding pass, federal agents attempted to arrest Dieye. Rather than comply, Dieye resisted and tried to destroy one of his phones. Notwithstanding Dieye's attempt to flee, a Magistrate Court for the Eastern District of New York ("EDNY Magistrate Court") ordered Dieye to be released on a secured bond (the "Release Order"). The Court should revoke the EDNY Magistrate Court's Release Order for at least three reasons.

*First*, the facts before the EDNY Magistrate Court—*e.g.*, Dieye moving his belongings overseas and attempting to board a one-way flight to Malaysia while aware that he was under federal investigation—did not support releasing Dieye.

*Second*, JFK Airport surveillance footage obtained post-Release Order evidences that Dieye not only resisted arrest, but he also attempted to obstruct justice by trying to destroy his phone when federal agents approached.

*And third*, Dieye deliberately misled the EDNY Magistrate Court to secure the Release Order. Dieye informed the EDNY Magistrate Court that he and his family were going to Malaysia on a one-way ticket for a family vacation. But records seized from his phone pursuant to a search warrant, post-Release Order, show that *Dieye was researching how to buy a home in Malaysia*. The Court should detain Dieye pending trial.

## II. BACKGROUND

### A. Investigation and Arrest

Dieye has been the subject of an ongoing investigation into a significant nationwide bank fraud conspiracy, aggravated identity theft scheme, and passport fraud scheme for several years. During that investigation, federal law enforcement has compiled over four terabytes of evidence illustrating that Dieye is the mastermind behind a multi-state bank takeover conspiracy. Additionally, federal agents have uncovered Dieye's fraudulent use of numerous individuals' identities, as well as his use of synthetic identities, which he has leveraged to fraudulently secure two United States passports—the crimes for which he is currently charged—and further his bank takeover conspiracy.

As the United States was uncovering additional evidence of Dieye's crimes, it learned through surveillance and discussions with individuals familiar with Dieye that:

- Dieye was aware of the government's investigation;[1]
- In or around late May/early June 2026, Dieye moved out of his Dallas apartment with his family and did not provide his apartment complex with a forwarding address; and
- At that same time, Dieye and his family shipped much of their possessions to Kenya.

On June 23, 2026, the government learned that Dieye and his family had traveled to New York and were about to board a one-way flight out of JFK Airport to Malaysia.

---

[1] In addition to recent surveillance and discussions with individuals familiar with Dieye, the United States' execution of multiple search warrants—including the search of Dieye's apartment in Dallas (3:25-MJ-221-BW)—make it undeniable that Dieye was aware that he was under federal investigation when he attempted to flee the country. Dieye's attempts to feign ignorance before the EDNY Magistrate Court strain credulity.

The government immediately sought and obtained an arrest warrant for passport fraud in violation of 18 U.S.C. § 1542.

After Dieye scanned his ticket to board the flight to Malaysia, he was approached by a federal agent. Dieye physically resisted arrest—in front of his wife and two toddlers—but he was eventually subdued and detained. At the time of the EDNY Magistrate Court proceedings, the United States did not have access to the JFK Airport surveillance footage; thus, the extent of Dieye's resistance and obstruction was unknown.

**B. Magistrate Court Proceedings**

On June 24, 2026, United States Magistrate Judge Henry in the Eastern District of New York held a removal and detention hearing in Dieye's case. *See United States v. Dieye*, 1:26-mj-000126-MMH-1 (June 24, 2026); *see* Exhibit A, June 24, 2026 Transcript of Proceedings Before the EDNY Magistrate Court. After Dieye waived a preliminary hearing (Ex. A at 8:6–9), the United States moved to detain Dieye, asserting that:

- Dieye "is the subject of a major government investigation into a nationwide bank fraud scheme that involves identity theft, impersonation of other people, and the use of counterfeit identification" (*id.* at 14:2–6);
- The United States knew from its investigation that Dieye "had vacated the home that he was in in Dallas, Texas, shipped his belongings overseas, and had purchased a one-way ticket to Malaysia" (*id.* at 14:7–11);
- Dieye was arrested at JFK Airport while attempting to board a one-way flight with his family to Malaysia (*id.* at 13:7–10);
- Dieye swiped his boarding pass before he was arrested (*id.* at 14:12–13); and
- Dieye has an extensive criminal history (*id.* at 14:23–24).

Additionally, the United States emphasized that Dieye—a dual citizen of the United States and Senegal—has no real ties, "in terms of employment and residence," to the United States. For example, Dieye's wife is a citizen of the United Kingdom. *Id.* at 15:2–4. And Dieye listed his employment as "involving [the] buying and selling of land in Senegal and then some other joint venture with an Australian investor." *Id.* at 15:5–8. The United States also noted that Dieye "has access to significant funds in the form of crypto." *Id.* at 15:13–14.

In response, Dieye asserted that he was not fleeing. Rather, he claimed that he and his family were going on a vacation where they would visit multiple countries and book a return ticket when they were ready to come home. *Id.* at 17:3–6. Dieye conceded that his wife is a citizen of the United Kingdom and that he and his wife shipped some of their belongings to Kenya. *Id.* at 16:15–18.

The EDNY Magistrate Court stated that it was concerned about Dieye's one-way ticket to Malaysia—a country it believed might not extradite Dieye if he fled. *Id.* at 16:23–25. The court even stated that "it looks like flight and a strong risk of it." *Id.* at 18:23–24. And the court recognized that Dieye has "been committing [crimes] in multiple jurisdictions." *Id.* at 18:11–12; *see also id.* at 21:8–9 ("I think that his prior criminal arrests and I think that there's a real risk here."). But then, after recognizing Dieye's attempted flight and the continuing risk of flight, the EDNY Magistrate Court concluded: "I think this is a bailable case." *Id.* at 18:13–14. It accordingly gave Dieye until the next day to try to procure a secured bond. *Id.* at 23:2–3; *id.* at 25:5–9.

On June 25, 2026, the EDNY Magistrate Court recalled Dieye's case. Exhibit B, June 25, 2026 Transcript of Proceedings Before the EDNY Magistrate Court. After additional argument—where Dieye emphasized that he was going on a three- to four-week family vacation, not fleeing (*id.* at 10:24–11:4), the Magistrate Court ordered Dieye released on a secured bond. *See id.* at 28:9–11.

That same day, Judge Karen Gren Scholer signed an Emergency Order that stayed Dieye's release pending further order. *See United States v. Dieye*, 3:26-MJ-769-BW at ECF 4 (June 25, 2026). The next day—after the EDNY Magistrate Court declined to transfer Dieye to the Northern District of Texas—Judge Scholer ordered "the United States Marshal's Service to transport [Dieye] immediately to the Dallas Division of the Northern District of Texas, where he shall remain in custody pending further order of this Court." *Id.* at ECF 5 (June 26, 2026) (cleaned up). On July 15, 2026, the United States was informed that the Marshals had transferred Dieye to Oklahoma. Dieye appeared for the first time in the Northern District of Texas on July 22, 2026. *See* 3:26-cr-00381 at ECF 9.

### C. JFK Footage and Dieye's Phone

Since the EDNY Magistrate Court ordered Dieye released, there have been three significant developments that have corroborated Dieye's attempt to flee, obstruct justice, and mislead the EDNY Magistrate Court.

*First*, the United States received surveillance footage from JFK Airport, which reveals that Dieye not only resisted arrest, but also attempted to destroy evidence.

Critically, the EDNY Magistrate Court did not have the benefit of this footage, and the United States did not know the extent of Dieye's resistance until it received the footage.

The JFK Airport footage shows that, immediately after Dieye scanned his one-way ticket to board a flight to Malaysia—with his wife and two toddlers who are standing directly behind him in the cropped clip below—a federal agent approached him to place him under arrest.




*See* Exhibit C, JFK Airport Surveillance Footage – Export C0240 at 00:19.

Instead of complying with the agent, Dieye turned and began to walk away.




*See id.* at Export C0240 at 00:22.

As the federal agent tried to detain Dieye, Dieye raised his arm then threw his phone on the ground in an attempt to destroy evidence.



*See id.* at Export C8059 at 00:30–00:34 (showing Dieye—in the yellow shirt above—raising his arm as a federal agent tries to stop him, then showing Dieye following through as he throws his phone on the ground and looks at the smashed phone).

Because Dieye refused to comply, federal agents were forced to subdue him.



*See id.* at Export C8059 at 00:37.




*See id.* at Export C0240 at 00:39.

In the end, it took several federal law enforcement officials to restrain Dieye and place him under arrest as his wife and two toddlers stood by mere feet away.




*See id.* at Export C0240 at 00:52.

*Second*, the government executed a search warrant on the two phones Dieye possessed when arrested. Records obtained from one phone evidence that, contrary to his misrepresentations to the EDNY Magistrate Court, Dieye was *not* going on a one-way trip to Malaysia for vacation. He was moving to Malaysia, as his research into *how to buy a house in Malaysia* shows:




Exhibit D, Search Results from Dieye's Seized Phone.

*And third*, records obtained from Apple pursuant to a subpoena revealed that the iPhone Dieye attempted to destroy was registered under yet another alias rather than Dieye's real name: P.J. *See* Exhibit E, Apple Return – Account Details.

## III. LEGAL STANDARD

When reviewing a magistrate judge's order of pretrial release, "the district court acts *de novo* and must make an independent determination" of whether release is proper. *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992) (citing *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)); 18 U.S.C. § 3145(a)(1). A district court, making an independent determination, can order pretrial detention even where the magistrate has declined to do so. *Id.* Moreover, the district court's review of the record developed before the magistrate judge is an appropriate procedure to comply with its obligation under § 3145. *See United States v. Farguson*, 721 F. Supp. 128, 129 n.1 (N.D. Tex. 1989).

The Bail Reform Act of 1984 authorizes pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community *or* a flight risk; it is not necessary to prove both. *See Fortna*, 769 F.2d at 249. A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, while a finding that a defendant is a flight risk must be supported by a preponderance of the evidence. 18 U.S.C. § 3142(f); *United States v. Acosta-Leyva*, 751 F. App'x 594, 595 (5th Cir. 2019) (citing *Fortna*, 769 F.2d at 243).

Courts must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including past conduct, criminal history, and probation status; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

## IV. ARGUMENT

There are no conditions, nor combination of conditions, that can reasonably assure Dieye's appearance before the Court. In addition to facing serious federal charges, Dieye has demonstrated that he was willing to flee, destroy evidence, and mislead a federal court. The Court should revoke the EDNY Magistrate Court's Release Order and detain Dieye pending trial.

### A. Nature and Circumstances of the Offense

A grand jury indicted Dieye on two serious federal charges that he committed by actively deceiving the United States. *See* ECF 7. Specifically, Dieye applied for and obtained a United States passport on two occasions while intentionally choosing not to disclose his use of a synthetically created identity (*i.e.*, a fake, manufactured identity). Dieye's willful and intentional deceit caused the United States to issue two national security documents that fail to account for one of the several identities he uses in ordinary life. Indeed, the manufactured identity that Dieye failed to disclose—A.F.—is the very identity he used to sign an apartment lease for himself and his family just three months before his first application.

Critically, Dieye's commission of passport fraud is only the beginning of his criminal activities. The United States is aware of Dieye using several other synthetic identities, in addition to possessing the personally identifying information ("PII") of *over three thousand real individuals*. Indeed, at the heart of Dieye's bank takeover conspiracy was his, and his coconspirators', use of victims' identities, which included the manufacturing of numerous counterfeit identity documents, including social security cards, drivers' licenses, and the like.

While Dieye has not yet been charged with that scheme (*he will be in short fashion*), the extent to which Dieye is willing to use other individuals' identities, or even synthetic identities, to deceive and defraud underscores how serious the charges against him are. It also underscores that Dieye poses a serious flight risk. Armed with the PII of thousands of individuals, and other synthetic identities, Dieye is but one counterfeit ID away from making another attempt at escape. This is not mere speculation. That Dieye was arrested while possessing an iPhone registered under yet another alias proves that he was actively continuing to conceal his identity mere weeks ago. *See* Ex. E.

The charges Dieye faces are serious, and they are based specifically on his willingness to deceive the United States by using fake or stolen identities. The nature and circumstances of the offense accordingly support detention.

### B. Weight of the Evidence

The evidence against Dieye is strong.[2] Dieye applied for and obtained two United States passports—one application on November 16, 2022, and the other on April 3, 2024. *See* Exhibit F, 2022 Passport Application; Exhibit G, 2024 Passport Application. Both applications directed Dieye to: "List *all* other names you have used." *See id.* Dieye intentionally withheld his use of A.F. from the United States to secure both passports. And there is no doubt that Dieye used A.F. as his identity. Dieye identified himself as A.F. in his August 25, 2022 residential lease application—an application that he made just three months before his first fraudulent passport application. *See* Exhibit H, Residential Lease Application. Employees from Dieye's former residence corroborate Dieye's use of the alias A.F., identifying him as the man they believed to be A.F. And Dieye possessed a New Jersey driver's license with his image but the synthetic A.F. identity. *See* Exhibit I, A.F. Driver's License.

Finally, Dieye's premature *legal* arguments at the EDNY Magistrate Court proceedings about whether he was obligated to disclose his fake identities (he was) have no relevance in determining whether he should be detained. A grand jury charged Dieye with two federal crimes, the evidence supports those charges, and as established below in Part IV(C), Dieye demonstrated that he has no intent to face those charges. The weight of the evidence accordingly supports detention.

---

[2] While the weight of the evidence is a factor that courts consider, courts "have found this factor to be of least importance in the detention determination." *United States v. Nwagbara*, 2011 WL 6372342, at *2 (N.D. Tex. Dec. 19, 2011).

### C. Dieye's History and Characteristics

The history and characteristics of Dieye could not support detention more. Dieye has been the subject of an ongoing federal investigation into a nationwide bank takeover conspiracy, aggravated identity theft scheme, and passport fraud scheme, among other crimes, for several years. *See* Ex. A at 14:2–6.[3] Critically, Dieye knows that he has been the subject of a federal investigation. *See supra* Part II(A) and n.1.

In or around late May/early June 2026, Dieye moved out of his home in Dallas and moved his possessions to Kenya. *See* Ex. A at 14:7–11. He then attempted to board a one-way flight to Malaysia with his family on June 23, 2026. *See id.* When federal agents arrested Dieye, he resisted and attempted to destroy one of his two phones. *See* Ex. C. Records seized from one of those phones reveal that Dieye was researching how to buy a home in Malaysia. *See* Ex. D. Notwithstanding his intent to purchase a home in Malaysia, Dieye deliberately misled the EDNY Magistrate Court, claiming that he was merely going to Malaysia on a vacation with his family. *See* Ex. A at 17:3–6; Ex. B at 10:24–11:4.

Dieye's lack of ties to the United States further support detention. Dieye is a dual citizen of the United States and Senegal, and his wife is a citizen of the United Kingdom. *See* Ex. A at 16:15–18. Furthermore, Dieye claims that his income is derived via his ownership of property in Senegal and his joint venture with an Australian investor. *Id.* at 15:5–8.

---

[3] The United States proffered the facts captured in Exhibit A based on what federal agents would testify if called at a detention hearing.

Finally, Dieye has an extensive criminal history that spans several jurisdictions (Ex. A at 14:23–24), which the EDNY Magistrate Court recognized posed a significant risk of flight (*id.* at 18:11–12; *see also id.* at 21:8–9). While not a full summary of Dieye's criminal history, Dieye has been: charged with felony aggravated assault (Pennsylvania, 2008); convicted of retail theft (Pennsylvania 2010); charged with drug act violations (Pennsylvania 2010); had class A misdemeanor unlawful carrying of a weapon charges accepted (Texas 2024); and convicted of felony theft (Texas 2026). Dieye's most recent conviction for felony theft occurred on February 13, 2026. Dieye was sentenced to 180 days' imprisonment. Within just four months of his most recent conviction, Dieye attempted to flee the United States to avoid federal prosecution. Dieye's history and characteristics underscore that he is a flight risk and weigh heavily in favor of detention.

### D. Danger to the Community

While Dieye has not been charged with violent crimes since 2008, his willingness to steal other individuals' identities and deceive and defraud anyone, including the United States, poses a continued risk to the community. That is particularly true where Dieye will have even more reason to try to continue his use of fake identities to flee. *See* Ex. E (evidencing that Dieye was continuing to conceal his identity through the use of aliases at the time of his arrest).

## V. CONCLUSION

There are no conditions or combination of conditions that would sufficiently mitigate the flight risk Dieye poses. Accordingly, the Court should revoke the EDNY Magistrate Court Release Order and order Dieye detained pending trial.

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY



MICHAEL J. MURTHA
Assistant United States Attorney
Texas Bar Number 24116801
1100 Commerce Street, Suite 300
Dallas, Texas 75242
Telephone: (214) 659-8600
Facsimile: (214) 659-8805
Michael.Murtha@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was filed via the Court’s CM/ECF System on this 29th day of July 2026.

/s/ *Michael J. Murtha*
MICHAEL J. MURTHA
Assistant United States Attorney