# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Docket#** 26-mj-00127-MMH |
| - versus - | U.S. Courthouse, Brooklyn, New York |
| MUHAMED DIEYE, Defendant | June 25, 2026, 2:38 p.m. |

TRANSCRIPT OF CRIMINAL CAUSE FOR CONTINUED ARRAIGNMENT
BEFORE THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Joseph Nocella, Jr., Esq.**
Interim United States Attorney

BY: **Amanda Muros-Bishoff, Esq.**
Assistant U.S. Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Michael D. Weil, Esq.**
Federal Defenders of New York
One Pierrepont Plaza, 16th Fl.
Brooklyn, NY 11201

**Transcription Service:** **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: ...mj-127, *The United States v. Muhamed Dieye*.

Counsel, starting with the government, please state your appearances.

MS. MUROS-BISHOFF: Good afternoon, your Honor. Assistant U.S. Attorney Amanda Muros-Bishoff for the government.

THE COURT: Good afternoon.

MR. WEIL: Good afternoon, your Honor. Federal Defenders by Michael Weil.

THE COURT: Good afternoon.

So this is a continuation of a discussion we had yesterday and Mr. Dieye first appeared. And at that time, I heard from the parties. There was some discussion around first, Mr. Weil, you being appointed as counsel in this case. There was not a financial affidavit yesterday. I have been handed a financial affidavit today. And I just want to confirm that this is Mr. Dieye's signature at the bottom, Mr. Weil.

THE DEFENDANT: Yes, your Honor.

MR. WEIL: Yes, your Honor.

THE COURT: Okay. Thank you. Now, I have to say that based on the information in this affidavit I don't think that you qualify for appointed counsel, Mr. Dieye. So I'm going to carry over the appointment for

today because again, you have to have counsel to be present and remember, you have the right to remain silent before you respond. But I'm not sure that you qualify for appointed counsel based on what's here.

So Mr. Weil, I'm going to continue to appoint you for today and then this will have to be resolved thereafter. Okay?

MR. WEIL: Thank you, your Honor.

THE COURT: All right. Now onto the other issue from yesterday which was conditions of release. The government continues to oppose release in this case?

MS. MUROS-BISHOFF: Yes, your Honor, that's correct.

THE COURT: Okay. And just so that I'm clear, the Pretrial Services report that I was handed, this is the same updated version that was provided yesterday afternoon at 3 o'clock?

MR. WEIL: Yes, Judge.

THE COURT: Okay. It hasn't been updated since yesterday?

MR. WEIL: There's some updated information regarding the potential surety, just they were able to reach them. So besides that --

UNIDENTIFIED SPEAKER: Yeah, it's the same report.

THE COURT: Okay. Yes. I think this is the same one that I have from yesterday. Yes.

So what, if anything, have counsel discussed since yesterday or what else is there to be presented to the Court?

MR. WEIL: Your Honor, I have a surety to present to the Court and just some additional information to present to the Court if I may.

THE COURT: Okay. Have you shared this with --

MR. WEIL: I have, your Honor.

THE COURT: -- Ms. Muros-Bishoff?

MR. WEIL: Yes.

THE COURT: Okay. Go ahead.

MR. WEIL: I have shared all of this information with the government.

First, I did go online and determined that there is an extradition treaty between Malaysia and the United States. I just wanted to establish that.

Secondly, your Honor, I went on to the -- and this goes to the strength of the case which is a bail factor. I went on to the Department of State website to pull the passport application. It is the court form. I have no reason to believe it's changed. I was unable to pull up the 2022 and 2024 passport forms. But I just wanted to -- and I gave the government a copy and I'd

like to submit it to the Court.

(Pause)

THE COURT: Okay. What am I --

MR. WEIL: Point out that on the first page at section 9 where it discusses including other names you may have used it indicates that you should enter all legal names previously used to include maiden name, name changes, and previous married names. It says that at page 1 of that and then there should be instructions. And then if you turn, if you didn't read the instructions, if you turn to the form itself and you turn to the --

THE COURT: The last page?

MR. WEIL: The last page, your Honor, where it has names, but it's the Section 9 -- oh I'm sorry, the second to last page, Section 9. This is right above the part where you put the photo. It says list all other names you have used. Examples, birth name, maiden name, previous marriage, legal name change. I think the obvious import of the application is that they want you to include names for legally used and that it is not asking the applicant to repeat on his or her passport application their illegal use of a name. That is not what they're seeking.

So and the statute itself, it's a statute that

requires intent. I think it uses the word willfulness. But I don't think anyone reading that would assume they were supposed to include that information. So I think there are serious issues as to the strength of the government's case here.

And the other issues the government raised about what else they're investigating can't trump a fundamental issue with the case. I note that that language, I know there was a probable cause determination by a magistrate in Texas but I'm aware that's not a full review at this point. But that language was not brought to the attention of the magistrate in the arrest warrant application.

Beyond that, your Honor, we are asking for his release at this time on a $50,000 bond with the conditions proposed by Pretrial. That would be a secured bond to be signed by his cousin, Sammed Okyne. He owns a property that he bought for $50,000. He rehabs properties (indiscernible) --

THE COURT: Can you pull the mic a little closer? Thank you.

MR. WEIL: He's a contractor who buys properties, flips them, renovates them, flips them. So he bought a property in Baltimore, a four-family home for $50,000. He's in the course of renovating it. He

believes that its subsequent value post renovation will be close to $400,000. There's no debt on the property. He owns this through an LLC. I have shown the government proof of his LLC including a form from the IRS as well as evidence of his ownership of the property including title insurance and a deed as well. He understands fully he won't be able to sell the property as long as this bond is in place. And I indicated to him he might be required to file some sort of lien in favor of the government.

THE COURT: So you're proposing the bond plus the posting of the property?

MR. WEIL: $50,000 bond secured by his property.

THE COURT: Okay. Ms. Muros-Bishoff?

MS. MUROS-BISHOFF: Yes, your Honor. The government still opposes release and, you know, reiterates our arguments yesterday that the defendant represents a very high risk of flight given his conduct in the past few weeks. It's the government's understanding that the defendant is aware of the ongoing investigation regarding a very large nationwide bank fraud scheme and that he sold or shipped his belongings overseas, vacated his home in Dallas, Texas, and purchased a one-way ticket to Malaysia, went to JFK airport and swiped his boarding pass and attempted to

board that flight.

In addition, what counsel's referring to in terms of the blank current form for submitting a passport, you know, the defendant will have the opportunity to challenge the government's case and the evidence. But in terms of detention, the risk of flight is so high here that it outweighs any consideration of the defendant's possible defenses later on to the charge.

In addition, what counsel has suggested for a bond package, it's the government's position that that is insufficient based on the very high risk of flight.

THE COURT: Insufficient how? Understanding that the government opposes release, what makes the proposed package insufficient?

MS. MUROS-BISHOFF: The amount of the bond given -- the defendant has indicated -- he told Pretrial Services he owns land, I think eight plots of land in Senegal. His wife is a citizen of the United Kingdom. He has dual citizenship with Senegal. And given, you know, his actions in recent time and his ownership of property abroad, it's the government's position that that bond is insufficient to secure the defendant's appearance on future court dates.

THE COURT: So if the bond was higher, you think it would be sufficient?

MS. MUROS-BISHOFF: No.

THE COURT: Okay.

MS. MUROS-BISHOFF: It's still our position that the defendant should be detained.

THE COURT: Understood. So Mr. Weil, do you have any other further information about this? I appreciate you checking on the treaty status between the United States and Malaysia, but one fact about this that has been bothering me since I learned it yesterday, and I don't know if it's been clearly addressed, one of the reasons that you stated for Mr. Dieye I guess deciding to relocate from Texas had to do with financial difficulties. And I guess I'm just trying to square that with the fact that he purchased a one-way ticket to Malaysia.

MR. WEIL: So I have that, your Honor, I did discuss that. He moved in with his mom who, by the way, is also here as well, and has no information that her son was leaving the country. He didn't say goodbye. Leaving the country permanently. He didn't say goodbye. He has two children, two 20-month-old twins. Those are her grandchildren. She does not believe he was leaving the country to permanently separate her from her grandchildren or to permanently have his children live outside the United States or away from him.

The family -- the government is correct. He has ties to other places like many of us do, but there's nothing nefarious about that. His wife has an Irish father and a Kenyan mother and UK citizenship and family in Singapore that they were going to stay with. And she has friends in Asia. The family knows people in that area. And the defendant himself has a degree in international business. That's what he started at Temple. He studied in Dubai. He himself has lived in other countries. There's nothing, again, nefarious about that.

He says that they decided to take this trip to visit family. They were going to stay with people, they were going to stay with family. The kids could be on their laps. So it was really just the cost of the tickets to do this trip.

This is not a case of somebody who was going on some super expensive trip to Fiji or anything of that nature. They had some financial trouble. He was just in jail for a period of time on that Texas case which I think contributed to his financial troubles. They decided to move back to the Philadelphia area and take a trip abroad to see family. That is the extent of it.

And I understand the Court's concern about the one-way ticket. They didn't know where they were -- they

know a number of people and they didn't know what their next stop or exactly how long it was going to be but it was in terms of two or three or four weeks. But he was not leaving the country.

The government, to be clear, your Honor, has said -- some of the government's statements really haven't been tested at all including that he knew he was the subject of this big investigation. There's only an issue of flight if you know people are looking for you. I understand the government has proffered that but given the complaint in this case, I think the Court should just be concerned about accepting these assertions at face value.

THE COURT: Let me ask you a question. If Mr. Dieye is released, where is he going to reside?

MR. WEIL: With his mom.

THE COURT: In Philadelphia?

MR. WEIL: I mean he's going to have to go to -- it's not Philly, it's the Philly area, yes.

THE COURT: In Pennsylvania, in the Philadelphia area?

MR. WEIL: Yes, your Honor. He's going to --

THE COURT: Okay. Is his mother willing to sign on to a bond for moral suasion purposes?

MR. WEIL: Yes, she is, your Honor. She is

a -- she mainly lives on Social Security at this point. She does a little work for a nonprofit, but she is prepared to sign on the bond for moral suasion.

THE COURT: Okay. Does Pretrial want to otherwise be heard?

PRETRIAL OFFICER: No, your Honor.

THE COURT: Okay. So the proposed sureties and the bond package that's been proposed here, I do think the combination of those conditions are sufficient particularly with Mr. Dieye's mother signing on to the bond to ensure that he is not going to flee and potentially have his mother owe the United States Government $50,000.

So for that reason, I think I'd like to have sureties -- are both sureties here?

MR. WEIL: Yes, your Honor.

THE COURT: Okay. So let's have the sureties come up to the podium.

(Pause)

THE CLERK: The judge will ask you questions so we'll put you under oath. Please raise your right hand.

T A G E D A C A R V A,

S A M M E D O K Y N E,

called as witnesses, having been first duly sworn, were examined and testified as follows:

THE CLERK: Please state your name for the record. Speak loudly, this is being recorded. Your name?

MS. CARVA: My name is Tageda (phonetic) Carva (phonetic).

THE COURT: Ms. Carva, good afternoon.

MS. CARVA: Good afternoon.

MR. OKYNE; My name is Sammed Okyne.

THE COURT: Okyne?

MR. OKYNE: Yes, Okyne.

THE COURT: Can you spell that, please?

MR. OKYNE: O-K-Y-N-E. Sammed Okyne.

THE COURT: Sammed Okyne. Got you. Thank you, Mr. Okyne. Good afternoon.

So the reason why the both of you are standing here as you have heard during today's proceeding is because I am prepared to release Mr. Dieye on what is known as a secured bond. So what that means is the amount of the bond would be $50,000 and secured by the property that you, Mr. Okyne, I understand own.

Because this is a very serious responsibility for you to be sureties for this bond, you have to actually sign the document. I have to make that sure you understand what it means before you agree to do it.

As you've heard from Mr. Chin, I'm going to be

asking you questions and I would like your answers to be under oath. You've now been sworn to tell the truth in response to my questions.

So let me start with Ms. Carva. You are Mr. Dieye's mother?

MS. CARVA: Yes.

THE COURT: Okay. And are you currently working, ma'am?

MS. CARVA: I'm retired but I'm still doing some work. I have a non-profit organization for 20 years. So now I'm just doing some work with them.

THE COURT: Okay. And what's your primary source of income?

MS. CARVA: My Social Security.

THE COURT: Okay. And about how much money is that per month?

MS. CARVA: Both combined is 46,000.

THE COURT: Okay. For the year?

MS. CARVA: Yes.

THE COURT: Okay. Understood. And I don't have your address in front of me but what is the name of the town in which you live?

MS. CARVA: Lansdowne, Pennsylvania.

THE COURT: Lansdowne, Pennsylvania. Okay. And how long have you lived at that address?

MS. CARVA: Four years, three to four years now.

THE COURT: Okay. Do you own or do you rent?

MS. CARVA: I rent.

THE COURT: You rent? Okay. And how much is your monthly rent?

MS. CARVA: 1,400.

THE COURT: 1,400 per month?

MS. CARVA: Mm hm.

THE COURT: Okay. All right. Thank you. Stay there.

Mr. Okyne, how do you know Mr. Dieye?

MR. OKYNE: Mr. Dieye is my cousin.

THE COURT: Okay. And do you usually communicate or spend time with him?

MR. OKYNE: Not recently because we've been busy at work but yes, we grew up together.

THE COURT: Understood. And you mentioned that you've been busy with work. You can stand back from the microphone but I think it might be -- you can actually move it up because you're a little taller, so you can move it closer to you. What kind of work do you do?

MR. OKYNE: I'm a general contractor and I also manage a restaurant.

THE COURT: Okay. And how long have you been

doing that work?

MR. OKYNE: The restaurant about 13 years, general contract about seven years.

THE COURT: Okay. And about how much would you say that you -- how much income do you earn let's say on a monthly or annual basis?

MR. OKYNE: On an annual basis about 75, 80,000.

THE COURT: Understood. And I understand that you have -- hold on one moment, please.

(Pause)

THE COURT: I understand that you have a property at 2474 Shirley Avenue in Baltimore, Maryland?

MR. OKYNE: That's right.

THE COURT: Okay. And how long have you had that property?

MR. OKYNE: About two years.

THE COURT: Okay. Hold on. Felix, is that microphone working? I can hardly hear.

MR. OKYNE: No, it's not working.

THE COURT: No, it's not. I can hardly hear.

(Pause)

THE CLERK: It's low.

THE COURT: I'll turn up my volume. Okay. You said a couple of years.

MR. OKYNE: Yes, about two years.

THE COURT: Okay. Yes, that's better, thank you. And about how much do you owe on that house?

MR. OKYNE: Nothing.

THE COURT: Nothing. Okay. Do you know how much the house is worth?

MR. OKYNE: So the ARV right now -- as is value is probably about like 200 and change. The ARV is about 450 with the work I put in. 450, 500.

THE COURT: Okay. So about 200,000 without the work and 400,000 and change with the work?

MR. OKYNE: That's with like complete finish, but it's some working, it's active, it's actively working.

THE COURT: So you're actively --

MR. OKYNE: Yeah, being renovated.

THE COURT: -- renovating your property?

MR. OKYNE: Yes. Finishing up. Actively finishing renovating.

THE COURT: Okay. And what's the anticipated time frame for finishing the renovation?

MR. OKYNE: About two more months. I could estimate about two more months.

THE COURT: Two more months?

MR. OKYNE: Two months.

THE COURT: Okay. Now, the reason why I'm asking about this property is because part of the proposed bond package is that this property that you own is being put up to secure the bond. And I'll explain what that means in a moment.

What that means at least logistically for you is that you would not be able to sell that property while it is being used to secure this bond. Do you understand that?

MR. OKYNE: Yes, I understand. This property is planned doing some sober living.

THE COURT: I'm sorry?

MR. OKYNE: I'm planning doing sober living there, so --

THE COURT: You planned on living there?

MR. OKYNE: No, sober living. Like a sober living facility.

THE COURT: Oh, understood. Okay. But you couldn't sell it?

MR. OKYNE: No, I'm not selling it. I plan on doing a sober living facility.

THE COURT: Okay. And what's your time frame for that?

MR. OKYNE: For the sober living facility?

THE COURT: Yes. If you say that the

renovations will be done in a couple of months, when do you plan on using it?

MR. OKYNE: It's really on the paperwork, but I'll actively own the property while it's going on.

THE COURT: Right. The point being is the following. The reason why I have to ask these questions about the property and why I have to ask each of you about your income is because as you heard, the amount of the bond is $50,000. And if Mr. Dieye violates -- excuse me, if he does not violate any of the conditions of release that I'm going to explain in a moment, then you'll be fine. You wouldn't have to pay anything.

However, if he were to violate any of his conditions of release, then the effect for him is that he will be arrested and likely held in custody while his case is pending.

For each of you what it means is that you could owe the United States Government up to $50,000. Now, there are two of you but just because there's two of you doesn't mean that that would be split evenly. It means that each of you would be jointly liable for the full amount. So if one of you couldn't pay for some reason, the other one's still responsible for the full $50,000. Do you understand that?

MR. OKYNE: Right.

THE COURT: And Ms. Carva?

MS. CARVA: Yes.

THE COURT: Okay. So further, with respect to the property, if the property is being used to secure the bond and Mr. Dieye violates his conditions of release, then the government can seek an order from the Court essentially taking ownership or some other means of taking the property away up to the amount of the $50,000.

Now, you indicated that the property is worth more than that, which is fine, but there can still be some effect on your ownership if the government is seeking such an order and the Court were to grant such an order. So that's why I needed to ask about what you were doing with the property.

Now, what I'm going to do is explain what the conditions of release are and then confirm whether either of you have any questions, whether or not you understand these conditions, and whether you would still like to be sureties on Mr. Dieye's bond.

So Mr. Dieye, these are your conditions of release that combined with the fact that you have sureties are the least restrictive necessary to reasonably assure your appearance as required. You may -- excuse me.

First, you must appear in court as required and

surrender as directed for service of any sentence imposed.

You must not commit any federal, state, or local crimes while on release.

You must cooperate in the collection of a DNA sample if authorized by the law.

You must let the Court know in writing before you change where you live or what your contact information is.

You may not possess any firearms, destructive devices, or other dangerous weapons.

You may not use or unlawfully possess any narcotic drugs or any other controlled substances under federal law. That includes marijuana.

You must submit to Pretrial supervision and report to Pretrial Services as directed. That means you might be subject to random home visits to make sure you're complying with your conditions.

If you were to be arrested or otherwise have law enforcement contact, you need to let Pretrial Services know as soon as possible.

The passport which has been the subject of some conversation, where is that passport?

MS. MUROS-BISHOFF: I believe it was confiscated yesterday when --

THE COURT: At the airport?

MS. MUROS-BISHOFF: Yes.

THE COURT: Okay. What about the passport card? Because we talked about this 2024 passport card.

MS. MUROS-BISHOFF: I believe that was also previously confiscated.

THE COURT: Okay. So are there any other passports that Mr. Dieye has? Because the condition here is that those passports have to be surrendered. So you should talk to Mr. Weil about that first.

MR. WEIL: He has no other passport, your Honor.

THE COURT: Okay. Importantly, Mr. Dieye, you can't apply for any other passports. You can't apply for any passport cards. You can't apply for any documents that allow you to leave the United States.

Additionally, you are required to remain in the following areas. New York City, the Northern District of Texas for your court appearance is there, and the Eastern District of Pennsylvania which is where I believe your mother's home is located, and that's where you would be living. Have we confirmed that Lansdowne is the Eastern District of Pennsylvania? Is it near Philly?

MR. WEIL: I can look it up.

MS. MUROS-BISHOFF: I can look it up. I'm not

sure.

THE COURT: It's near Philly, right? Okay. Then it's in the Eastern District of Pennsylvania. Okay. Importantly, I'm adding the more specific condition about your court appearances is that you have to appear in the Northern District of Texas for court when directed to do so. All right? So those are all of the conditions of release.

Let me turn back to Ms. Carva and Mr. Okyne. Any questions about those conditions of release, Ms. Carva? Ms. Carva, do you have any questions?

MS. CARVA: No, I don't have any question right now.

THE COURT: Okay. Do you understand the conditions of release that I described?

MS. CARVA: Yes, I understand.

THE COURT: Thank you. Mr. Okyne, any questions about the conditions of release?

MR. OKYNE: Yes. So let's say he has a court date in five days, so would he have to be there five days before or --

THE COURT: He has to be there at the date and the time that the judge tells him to be there.

MR. OKYNE: I understand the day and the time, but can he be there a couple of days before so he can go

back and forth on a plane for Texas?

THE COURT: Yes. So to be clear, and that's a good distinction, when I say that he can be in the Northern District of Texas, he has to be able to travel between here, or between Pennsylvania rather, and the Northern District of Texas. So if a court date is on a Tuesday and he goes on a Monday, that's fine. He has to show up in court that day.

But the purpose of him being in the Northern District of Texas is for court. He's not going there for some other thing.

MR. OKYNE: Okay.

MR. WEIL: And just so it's clear, and your Honor --

THE COURT: Court and attorney visits as well.

MR. WEIL: Right. So if he needs to get there a day or two early to be ready, that's fine.

THE COURT: Right, to get ready, to meet with his lawyer, that's fine. But the purpose of the visit to Texas is in connection to the scheduled court date in Texas. Does that answer your question?

MR. OKYNE: Yeah, that answered my question.

THE COURT: Okay. Did you have any other questions?

MR. OKYNE: No other questions, your Honor.

THE COURT: Okay. And so then do you understand each of the conditions of release?

MR. OKYNE: Yes, ma'am.

THE COURT: And since you do understand them, are you willing to sign as a surety to the bond?

MR. OKYNE: Yes, ma'am.

THE COURT: And are you willing to pledge this property to the bond as well?

MR. OKYNE: Yes, ma'am.

THE COURT: Okay. Ms. Carva, are you willing to sign on to this bond?

MS. CARVA: Yes.

THE COURT: Okay. Mr. Chin is going to bring the documents over to you for signature. Please sign and put today's date which is June 25th.

MR. WEIL: I'm sorry, your Honor, he requested just a clarification for the trial. If, you know, he can get a better flight out of Newark or DC as people sometimes do --

THE COURT: From Philadelphia?

MR. WEIL: From Newark. I don't know which is -- but he said he sometimes might ask permission to fly -- may he fly out of other airports with permission of Pretrial?

THE COURT: With permission from Pretrial, yes.

MR. WEIL: Okay. You'd have to clear it.

THE DEFENDANT: Okay.

THE COURT: This is the Northern District of Texas, right?

MR. WEIL: Dallas, yes.

THE COURT: Dallas. Okay.

(Pause)

THE COURT: Okay. Ms. Carva and Mr. Okyne, you have both signed the bond as sureties. Thank you both very much. You can return to your seats in the gallery.

MS. CARVA: Thank you.

THE COURT: Thank you. Now, Mr. Dieye?

THE DEFENDANT: Yes, your Honor.

THE COURT: Two people who clearly care about you are willing to put their financial selves at risk for you, so I need to inform you about what can happen to you. I've already told them what can happen to them, but I need to let you know specifically what can happen to you if you violate any of the conditions of release I previously described.

First, if you fail to appear in court as required or to surrender for any sentence as required, then you can be arrested and held in custody. The bond will be revoked. You will be separately charged with crime of bail jumping. What that means is that's a

separate offense. You can be convicted of that offense even if your underlying charges are otherwise dismissed.

If you are convicted of the underlying charges and you're convicted of bail jumping, then any sentence for the bail jumping would be consecutive to the sentence for the underlying charge. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: If you otherwise violate your conditions of release, you could be arrested and held in custody. Your bond can be revoked. You can also be prosecuted for contempt of court. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: If you are convicted of crimes committed while you're on release, you can be arrested and held in custody or bond can be revoked. You could face additional jail time that is consecutive to any jail time for the underlying charges in this case. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: You may not attempt to threaten or influence the testimony of any witnesses in your case if there are any. If so, you could be arrested and held in custody. Your bond would be revoked. You could also be separately charged with the crimes of witness tampering

or obstruction of justice. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, we've been talking about the bond which is an actual document. Your mother and your cousin have already signed. And I see here that at the acknowledgments at the end you too have signed. Do you agree to abide by these conditions of release, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Having seen your signature and heard your responses, I'm now signing the order authorizing your release.

Further, let me note that because there is a property involved, part of the requirement is that a confession of judgment that is approved by the government, notwithstanding the government's objection to this release, is duly filed with the appropriate local authorities on or before July 6, 2026. Okay?

Anything else, Mr. Weil?

MR. WEIL: No, your Honor. I assume we don't have a court date in Texas as of yet.

THE COURT: That is my question for Ms. Muros-Bishoff.

MS. MUROS-BISHOFF: I actually had another application, your Honor. Given your determination to release Mr. Dieye on bond, the government is respectfully

requesting a stay to appeal the determination to the district judge that is overseeing this matter in the Northern District of Texas.

THE COURT: Until when? 5 p.m.?

MS. MUROS-BISHOFF: Yes, that's fine.

THE COURT: Okay.

MR. WEIL: That's fine. May I ask that the passport application form that I submitted --

THE COURT: Yes. Everything --

MR. WEIL: -- be made part of the record?

THE COURT: Oh, that --

MR. WEIL: Be made part of the record. I'll file it on ECF with a brief letter saying this is the form I submitted today.

THE COURT: Sure. Yes. Best if you file it on ECF.

MR. WEIL: Yes. I'll file this on ECF.

THE COURT: Okay. Anything else?

MS. MUROS-BISHOFF: Not at this time, your Honor.

MR. WEIL: I have one more thing, your Honor.

THE COURT: Yes.

MR. WEIL: We would respectfully request that the court in Texas be notified that Mr. Dieye is requesting the appointment of counsel for purposes of the

appeal of the stay.

THE COURT: That he is requesting counsel be appointed there --

MR. WEIL: For purposes of the appeal.

THE COURT: -- for the purposes of the appeal.

MR. WEIL: That the government be ordered to notify the court of that.

THE COURT: Ms. Muros-Bishoff? You're going to notify them that this is happening and --

MS. MUROS-BISHOFF: Yes.

THE COURT: -- that he is requesting counsel for the purposes of the appeal because that's the proceeding that's going to be before the Northern District of Texas.

MS. MUROS-BISHOFF: Yes. And I also just wanted to clarify from your Honor in terms of the deadline, I believe Texas is on central time, the Northern District of Texas.

THE COURT: I meant 5 p.m. eastern time. It's 3:15 right now.

MS. MUROS-BISHOFF: Okay.

THE COURT: Okay. Thank you. We're adjourned.

(Matter concluded)

-oOo-

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **26th** day of **June**, 2026.

Mary Greco

Transcriptions Plus II, Inc.